**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**Newark Vicinage**

|  |  |
|---|---|
| RAY ALLEN LUENSE, PAMELA PEARSON, DANIEL F. SETTNEK and NEIL ROSE, individually and as representatives of a class of participants and beneficiaries on behalf of the Konica Minolta 401(k) Plan, | CIVIL ACTION NO.: _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| KONICA MINOLTA BUSINESS SOLUTIONS U.S.A., INC., BOARD OF DIRECTORS OF KONICA MINOLTA BUSINESS SOLUTIONS U.S.A., INC., KONICA MINOLTA 401(K) PLAN COMMITTEE, SANDRA SOHL, SUSAN MCCARTHY, and JOHN DOES 1-30, | |
| Defendants. | |

## I.  <u>INTRODUCTION</u>

1.      Plaintiffs Ray Allen Luense, Pamela Pearson, Daniel F. Settnek and Neil Rose ("Plaintiffs"), by and through their attorneys, on behalf of the Konica Minolta 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, allege as follows.

2.      This is a class action brought pursuant to §§ 406, 408, 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1106, 1108, 1109 and 1132, against the Plan's fiduciaries, which include Konica Minolta Business Solutions U.S.A., Inc. ("Konica," "KMBS" or the "Company"), the KMBS Board of Directors ("Board") and its

---

[1] The Plan is a legal entity that can sue and be sued. *See* ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the case law interpreting it, the relief sought in this action is for the benefit of the Plan, its participants and beneficiaries.

members during the Class Period (defined below), the Konica Minolta 401(k) Plan Committee ("Committee") and its members during the Class Period, Sandra Sohl, Susan McCarthy, and John Does 1-30 for breaches of their fiduciary duties.

3.  Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016)[2]; *see also* PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015).[3]

4.  In a defined *contribution* plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Thus, absent legal protections for employee-participants, the employer has limited incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the participants.

5.  To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019), *cert. denied sub nom. Univ. of PA v. Sweda*, No. 19-784, 2020 WL 1496631 (U.S. Mar. 30, 2020). Fiduciaries must act "solely in the interest of the participants

---

[2] Available at: https://www.ici.org/research/stats/retirement/ret_15_q4 (last visited Jan. 14, 2020).
[3] Available at:  https://www.plansponsor.com/research/2015-recordkeeping-survey/ (last visited Jan. 14, 2020).

and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

6.      Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million), "Mid" plans ($50 million-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion).

7.      As of December 31, 2017, the Plan had more than $810 million in assets, and as of December 31, 2018, the Plan had more than $766 million in assets.

8.      The Plan's assets are entrusted to the care of the Plan's fiduciaries. The Plan's assets under management qualify it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

9.      Plaintiffs allege that during the proposed Class Period (June 4, 2014 to the present) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to review objectively and adequately the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of virtually identical or similar investment options with lower costs and/or better performance histories.

10.     The Plan's imprudent investment options during the Class Period include: (1) Principal LifeTime Hybrid target date funds; (2) Fidelity Growth Company Fund; (3) Prudential Large Cap Value Fund; (4) Prudential Mid Cap Growth Fund; (5) Prudential International Growth

/ Artisan Partners Fund; (6) Prudential Small Cap Growth / TimesSquare Fund; (7) JPMorgan Small Cap Value Fund; (8) Dodge & Cox International Stock Fund; (9) PGIM QMA Small-Cap Value Fund; (10) PGIM QMA Mid-Cap Value Fund, (11) Prudential Day One IncomeFlex Target Balanced Fund, (12) Prudential Dryden S&P 500 Index Fund, and (13) Prudential Guaranteed Interest Contract Account.

11.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

12.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     <u>JURISDICTION AND VENUE</u>

13.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

14.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

15.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the Plans are administered, where at least one of the alleged breaches took place and where Defendant resides.

III.   **STANDING**

16.    An action under 29 U.S.C. § 1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *LaRue*, 552 U.S. at 254. 29 U.S.C. § 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2). As explained below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continuing losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though 29 U.S.C. § 1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

17.    Plaintiffs and all participants in the Plan suffered financial harm as a result of the imprudent investment options in the Plan, because Defendants' selection and retention of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent options.

18.    Plaintiffs' individual accounts in the Plan were harmed because they invested in investment options that would have been removed from the Plan had Defendants discharged their fiduciary duties. These investment options underperformed numerous prudent alternatives that were available to the Plan, resulting in a loss of retirement savings.

## IV.    PARTIES

### Plaintiffs

19.    Plaintiff Ray Allen Luense resides in Escondido, California. During the Class Period, Plaintiff Luense participated in the Plan, investing in certain options offered by the Plan, including:

- Goldman Sachs Mid Val Institutional,

- Mid Cap Growth/Artisan Partners (77 bps)[4],

- MFS Mid Cap Value Fund Class R6 (75 bps),

- DFA U.S. Small Cap Value Portfolio (51 bps for institutional in 2020),

- JPMorgan Small Cap Value Fund Class R6 (77 bps),

- International Growth /Artisan Partners Fund (78 bps in 2015, 79 bps in 2016-2020),

- Eagle Mid Cap Growth (IS Platform) (57 bps), and

- Guaranteed Long-Term Stable Value Acct. (55 bps in 2015).

20.    Plaintiff Pamela Pearson resides in Kingwood, Texas. During the Class Period, Plaintiff Pearson participated in the Plan, investing in certain options offered by the Plan, including:

- Principal LifeTime Hybrid 2025 CIT Z (34 bps in 2017, 30 bps in 2018, 29 bps in 2019),

- Retirement Goal 2020 Fund (56 bps in 2016), and

- Guaranteed Long-Term Stable Value Acct.

---

[4] The expense ratios for Plaintiffs' Plan investments are in parentheses and expressed in basis points, which is one hundredth of a percent or equivalently 0.01%.

21.     Plaintiff Daniel F. Settnek resides in Jeannette, Pennsylvania. During the Class Period, Plaintiff Settnek participated in the Plan, investing in certain options offered by the Plan, including:

- High Grade Bond / GSAM Fund (37 bps in 2015, 38 bps in 2016, 40 bps in 2020);

- Retirement Goal 2020 Fund,

- Principal LifeTime HYB 2020 CIT Z,

- Principal LifeTime Hybrid 2020 CIT Y

- Fidelity Growth Company Fund Class K (43 bps in 2020),

- Mid Cap Growth/Artisan Partners (77 bps)

- DFA U.S. Small Cap Value Portfolio (51 bps for institutional in 2020),

- JPMorgan Small Cap Value Fund Class R6 (77 bps),

- International Growth /Artisan Partners Fund (78 bps in 2015, 79 bps in 2016-2020).

22.     Plaintiff Neil Rose resides in Scottsdale, Arizona. During Class Period Plaintiff Rose participated in the Plan, investing in the Prudential Day One IncomeFlex Target Balanced Fund.

23.     Each Plaintiff has standing to bring this action on behalf of the Plan because each participated in the Plan and was injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

24.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan,

comparisons of the costs and investment performances of Plan investments versus available alternatives within similarly-sized plans, total or all-in cost comparisons to similarly-sized plans, information regarding other share classes that were available to but not offered by the Plan, and information regarding the availability and pricing of separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

25.     Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. Having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans. Plaintiffs did not and could not review the Committee meeting minutes or other evidence of Defendants' fiduciary decision making, or the lack thereof. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### Defendants

### Company Defendants

26.     Defendant Konica Minolta Business Solutions U.S.A., Inc. ("Konica," "KMBS" or the "Company") is a New York corporation that maintains its principal executive offices at 100 Williams Drive, Ramsey, NJ 07446.

27.     Defendant KMBS provides a variety of printing and imaging services to its business clients, including office printer systems, bulk production printers, printing and imaging software applications, and information technology strategy and consulting.

8

28.     Defendant Sandra Sohl has been the Director, Compensation, Benefits & HRIS for KMBS since April 2013, has signed certain of the Plan's forms 5500 filed with the U.S. Department of Labor on behalf of the employer or sponsor of the Plan, and, on information and belief, has served as a fiduciary of the Plan through her position with KMBS and/or her committee memberships during the time period relevant to this action.

29.     Defendant Susan McCarthy has been the Manager, Compensation & HRIS at KMBS since April 2014, has signed certain of the Plan's forms 5500 filed with the U.S. Department of Labor as the named administrator of the Plan, and, on information and belief, has served as a fiduciary of the Plan through her position with KMBS and/or her committee memberships during the time period relevant to this action.

30.     KMBS is the Plan sponsor, administrator, and a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) Konica is a named fiduciary under the Plan, (b) during the Class Period, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets, and (c) it appointed Plan fiduciaries through KMBS's Board of Directors (the "Board"), or a committee of the Board, which was entrusted with the authority to control the management, operation and administration of the Plan.

31.     At all times relevant to this action, as set forth in the Summary Plan Description dated January 1, 2016 ("SPD"), Konica has been responsible for "handling the day-to-day operations of the Plan," and Konica has been responsible for the administrative and investment responsibilities associated with the Plan and has been the "named fiduciary" and "plan administrator," as such terms are defined under ERISA.

**Board Defendants**

32.     Each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period, because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

33.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

34.     On information and belief, the Board has discretion to authorize Konica to contribute annual profit-sharing amounts to the Plan participants.

**Committee Defendants**

35.     On information and belief, Konica has delegated certain administrative and investment related duties to the Plan Committee ("Committee") and/or other committees and their members are named fiduciaries of the Plan (defined above as "Committee").

36.     On information and belief, the Committee is responsible for the following Plan functions:

- To act as a "Named Fiduciary" under ERISA with respect to the control and management of assets of the Plan and provide oversight of the investments and funding policies and objectives of the Plan.

- Establish and periodically review the investment management policies and/or guidelines of the Plan.

- Approve the appointment of investment managers for the Plan, and the policies and operating procedures governing investment managers.

- Monitor the investment performance of the Plan.

- Receive, review and keep on file reports of investment performance, financial condition, receipts and disbursements of the Plan's assets.

10

- Appoint and retain individuals to assist in the administration of the Committee's duties under the Committee Charter and under the Plan, including consulting services as it may require or as may be required by any applicable law or laws.

- Appoint and remove the trustee for the Plan and the Plan's trust.

- Report to the Board.

37.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

38.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

39.     To the extent that there are additional officers and employees of Konica who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Konica officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## V.     THE PLAN

40.     The Plan was established effective January 27, 1986 and most recently amended and restated in its entirety on January 1, 2010. The SPD asserted that KMBS established the Plan to "help[] you ***provide for your retirement security*** by making it simple and convenient for you to contribute to your retirement savings regularly." SPD at 1 (emphasis added). The SPD further

11

states, "The Plan is intended to meet federal tax law qualification requirements, allowing your savings to accumulate on a tax-deferred basis and *permitting you to save more dollars for your retirement*." *Id*. (emphasis added).

41.     The Plan is a single-employer "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

42.     According to the SPD, the "Plan['s] assets are held in a trust maintained by the Trustee," Prudential Bank & Trust, FSB. *Id*. at 3.

*Eligibility*

43.     The Plan covers substantially all "Covered Employees" of Konica and its affiliates who are at least 18 years of age and have completed at least 30 days of "Eligibility Service". The Plan defines "Covered Employees" as "common law employee of KMBS and its affiliates, and excludes independent contractors, leased employees, nonresident aliens, union employee who are not covered by a collective bargaining unit that provides for coverage under the Plan, Japanese employees, and temporary employees or interns. SPD at 4. Eligibility Service is defined as the number of days from an employee's hire (or rehire) date until his or her "Severance Date." *Id*.

*Contributions*

44.     Participants may contribute an amount equal to not less than 1% nor more than 50% of their compensation per year, subject to limitations of the Internal Revenue Code (the "Code").

Such contributions may be on a pre-tax or after-tax basis. Participants may also make rollover contributions from other qualified plans or IRAs. Participants direct the investment of their contributions into various investment options offered by the Plan. The Plan offers a guaranteed interest account and various pooled separate accounts and mutual funds as investment options for participants. Participant contributions are recorded on a cash basis which is the same as or approximates the period during which the Company makes payroll deductions from the participant's earnings.

45.     With regard to employee contributions, a participant may contribute up to 50 percent of his or her annual compensation, inclusive of pre-tax contributions and after-tax contributions, not to exceed the annual federal limit on the amount of 401(k) contributions.  SPD at 6.

46.     "The Company matches employee elective contributions in an amount equal to 50% of the participant's pre-tax contribution up to a percentage of the participant's eligible compensation, with any excess participant contributions excluded from the matching provision. During 2018 and 2017, the employer match on employee pre-tax contributions was 50% of up to the first 6% of eligible compensation. Employees may also make 'rollover contributions' to the plan from other qualified retirement arrangements. The Company does not match rollover contributions." Form 5500 for the year ended December 31, 2018.

### The Plan's Investments

47.     Various funds were available to Plan participants for investment during the Class Period, including but not limited to funds from Principal Trust Company and/or Principal Life Insurance Company, Prudential, JPMorgan, Fidelity, and MFS Funds. "The Plan Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance." *See* 2017 Form 5500 at 11.

48.     Defendants have designated the retirement date appropriate Principal LifeTime Hybrid CIT Z as the Qualified Default Investment Alternative ("QDIA") for the Plan. While a target retirement date fund may be an appropriate selection for a 401(k) plan's QDIA, the Principal LifeTime Hybrid target date funds were an imprudent selection due to the unreasonable expense of this investment option (29 bps in 2020) and underperformance as compared to numerous less expensive alternative target date funds, as shown in the charts below.

49.     According to the Plan's most recently filed Form 5500, as of December 31, 2018, the Plan offered the following investment options to its participants:

| IVESTMENT OPTION | Current value |
| --- | --- |
| *  Guaranteed Interest Contract | $191,230,964 |
| *  Prudential Large Cap Value Fund LSV Asset Mgmt | $37,944,395 |
| *  Prudential Mid Cap Growth/Artisan Partners Fund | $36,539,831 |
| *  Prudential Small Cap Growth/Times Square Fund | $20,241,889 |
| *  Prudential Day One IFX TGT Easypath Bal | $4,050,791 |
| *  Prudential Dryden S&P 500 Index Fund | $82,665,166 |
| *  Prudential High Grade Bond/GSAM Fund | $36,047,334 |
| *  Prudential Retirement QMA Mid Cap Index Fund | $1,643,127 |
| *  Prudential Retirement QMA Small Cap Index Fund | $1,903,986 |
| *  Prudential International Growth/Artisan | $36,345,188 |
| Principal LifeTime Hybrid 2055 CIT Z | $2,969,353 |
| Principal LifeTime Hybrid 2030 CIT Z | $27,061,435 |
| Principal LifeTime Hybrid 2045 CIT Z | $12,262,050 |
| Principal LifeTime Hybrid 2060 CIT Z | $790,872 |
| Principal LifeTime Hybrid 2020 CIT Z | $18,071,791 |
| Principal LifeTime Hybrid 2025 CIT Z | $32,524,441 |
| Principal LifeTime Hybrid 2035 CIT Z | $21,514,237 |
| Principal LifeTime Hybrid 2015 CIT Z | $5,317,711 |
| Principal LifeTime Hybrid 2050 CIT Z | $8,275,383 |
| Principal LifeTime Hybrid 2040 CIT Z | $12,724,283 |
| Principal LifeTime Hybrid 2010 CIT Z | $1,381,006 |
| Principal LifeTime Hybrid Income CIT Z | $309,480 |
| Principal LifeTime Hybrid 2065 CIT Z | $12,366 |
| Fidelity Growth Co Com PL | $112,445,003 |
| Dodge & Cox Intl Stock Fund | $11,404,076 |
| JPMorgan Small Cap Val R6 | $16,066,697 |
| MFS Mid Cap Value Class R6 | $15,034,614 |
|  | **$746,777,469** |

## VI.   <u>CLASS ACTION ALLEGATIONS</u>

50.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between June 4, 2014 and the present (the "Class Period").

51.    The members of the Class are so numerous that joinder of all members is impractical. According to the Form 5500 filed with the U.S. Department of Labor, as of September 30, 2018, there were 11,810 Plan participants with account balances.

52.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

53.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are fiduciaries of the Plan;
>
> B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

C.    Whether the Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

54.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

55.    This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

56.    In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

16

## VII.   **DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES**

57.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

58.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

59.    As described above, Defendants were fiduciaries of the Plan because:

    (a)    they were so named; and/or

    (b)    they exercised authority or control respecting management or disposition of the Plan's assets; and/or

    (c)    they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

    (d)    they had discretionary authority or discretionary responsibility in the administration of the Plan.

60.    As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with

17

such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

61.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).

62.     "Thus, in deciding whether and to what extent to invest in a particular investment, *a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income*. A decision to make an investment may not be influenced by non-economic factors unless the investment, *when judged solely on the basis of its economic value to the plan*, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

63.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

64.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA

18

a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds...could theoretically, in combination, create a prudent portfolio." *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at \*4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

65.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

66.     During the Class Period, Defendants did not act in the best interests of the Plan participants. Investment fund options chosen for a plan should not favor the fund provider over the plan's participants. Yet, here, to the detriment of the Plan and its participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

67.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's

investment options. Additionally, Defendants failed to leverage the size of the Plan to negotiate lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period.

68.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VIII.   <u>SPECIFIC ALLEGATIONS</u>

### A.     **Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings**

69.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

70.     The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan...Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[6]

---

[6]   Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited Mar. 24, 2020).

71.     As the Ninth Circuit explained, higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time, because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

72.     The Ninth Circuit provided an example of the impact of higher fees over a 40-year period, stating:

> As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year,4 at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%,5 the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively.

*Id.*

73.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[7] Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

74.     Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "*A Look at 401(k) Plan Fees*," *supra*.

---

[7] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited Mar. 24, 2020).

75.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[8] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

76.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons between funds. The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place funds in a given category based on their portfolio statistics and compositions over the past three years."[9]

77.     On average, there are lower expense ratios for 401(k) participants than those for other investors. *See The Economics of Providing 401(k) Plans*, at 11. ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones as measured by assets managed, lead to economies of scale and special pricing within mutual funds. *See id* at 10.

---

[8] Available at: https://www.ici.org/pdf/per24-04.pdf (last visited Mar. 24, 2020).
[9] Available at http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited Mar. 25, 2020).

78.    This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, these expense ratios fell 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds. *See id*. at 1.

79.    The most recent comprehensive average mutual fund expense data for plans of different sizes is from 2012, and industry analysts have recognized a marked trend toward lower fees in 401(k)s over the past four years. *See* Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, THE WALL STREET JOURNAL (May 15, 2016) (noting precipitous drop in overall 401(k) fees from 2012 to 2014).

80.    The table below illustrates how 401(k) plans on average pay significantly lower fees than regular industry investors, even as expense ratios for all investors have declined.

FIGURE 7
**Average Total Mutual Fund Expense Ratios**
*Percent, 2013–2015*

|  | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|
|  | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | **0.74** | **0.58** | **0.70** | **0.54** | **0.68** | **0.53** |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| **Hybrid funds** | **0.80** | **0.57** | **0.78** | **0.55** | **0.77** | **0.54** |
| **Bond funds** | **0.61** | **0.48** | **0.57** | **0.43** | **0.54** | **0.38** |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| **Money market funds** | **0.17** | **0.19** | **0.13** | **0.16** | **0.14** | **0.16** |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

*The Economics of Providing 401(k) Plans*, at 12. Notably, this table does not take into account cost differences between passively managed funds that are designed to mirror the performance of a market index, and actively managed funds that attempt to outperform the market with more aggressive investment strategies. Actively managed funds tend to have significantly higher

expense ratios compared to passively managed funds because they require a higher degree of research, more frequent trades, and greater monitoring.

81.     Thus, prudent and impartial plan fiduciaries should continuously monitor both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

### 1.     Passively Managed Funds Cost Less Than Actively Managed Funds

82.     Courts have noted that "an ERISA fiduciary's duty is derived from the common law of trusts." *Tibble*, 575 U.S. 523 (quotations and citations omitted). *See also Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996) (ERISA "fiduciary duties draw much of their content from the common law of trusts"). Thus, to the extent that ERISA is silent on the appropriate standard for selection and retention of investment options for a plan, courts should seek guidance from trust law. *Varity Corp.*, 516 U.S. at 496–97.

83.     Under the common law of trusts, the determination as to whether the selection of an investment is appropriate depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts § 100 cmt. b(1) (2012). The relevant factor that may be considered include "return rates of one or more suitable common trust funds, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id.*

84.     Here, each investment option within the Plan charged certain fees that are paid by deductions from the pool of assets held by the Plan. For passively managed funds, which are designed to track a market index like the Standard & Poor's 500, securities were purchased to

match the mix of companies within the index. Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

85.     By contrast, the Plan's actively managed funds, which have a mix of securities selected by the fund manager based on his or her belief they will beat the market, the Plan has paid higher fees in order to compensate the fund managers and their associates for the work associated with stock picking.

86.     While higher-cost mutual funds may outperform less-expensive passively managed index funds in the short term, they rarely do so in the long term. As noted by Jonnelle Marte in The Washington Post, *Do Any Mutual Funds Ever Beat the Market? Hardly* (Mar. 17, 2015), a study by S&P Dow Jones Indices that analyzed 2,862 actively managed mutual domestic stock mutual funds over a five-year period, found that "just two funds...managed to hold on to their berths in the top quarter every year for five years running. And for the 2,862 funds as a whole, that record is even a little worse than you would have expected from random chance alone."[10] Thus, the funds in the top quartile in performance failed to replicate performance from year to year. *See also Index funds trounce actively managed funds: Study* (June 26, 2015) (reporting that data shows that "actively managed funds lagged their passive counterparts across nearly all asset classes, especially over a 10-year period from 2004 to 2014.")[11]

87.     Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009)

---

[10] Available at: https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (last visited Mar. 25, 2020).
[11] Available at https://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html (last visited Mar. 25, 2020).

(hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967–75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

88.     Here, the Plan is dominated by expensive actively managed funds, which reflects a flawed fiduciary process. Out of 26 investment options, the Plan presently includes only three lower-cost passively managed index funds (the Prudential Dryden S&P 500 Index Fund, the Prudential Retirement QMA Mid Cap Index Fund, and the Prudential Retirement QMA Small Cap Index Fund). Moreover, the index funds chosen by Defendants were poor choices because they are among the more expensive index funds available.

89.     For example, the Prudential Dryden S&P 500 Index Fund has an expense ratio of 0.12%, which is at least three times the amount charged by comparable funds like the Vanguard Institutional Index Fund, which has an expense ratio of 0.04%, and the Fidelity 500 Index, which has an expense ratio of 0.02%. Furthermore, as shown in the performance chart below, the Plan's selection of actively managed funds were even worse choices for Plan because despite their high expenses they rarely, if ever, performed any better than far less expensive passively managed index funds.

### 2.     Institutional Share Classes Cost Less Than Investor Share Classes

90.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are sold to individual investors who have less bargaining power, while lower cost shares are sold to institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

91.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available. Even when a retirement plan does not meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan willing to add the fund to its menu of designated investment options. Thus, a fiduciary of a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available. For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

92.     The availability of lower-cost institutional class shares for large defined benefit plans has been widely known throughout the Class Period. For instance, a February 2016 article by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin, *Recent Class-Action Surge Ups the    Ante for 401(k) Advice*, INVESTMENTNEWS (Feb. 18, 2016).[12]

93.     Indeed, a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble*, 575 U.S. 523 *Int. et al.*, No. 07-5359, slip op. at 13 (C.D. Cal. Aug. 16, 2017).

---

[12]   Available   at:   https://www.investmentnews.com/recent-class-action-surge-ups-the-ante-for-401k-advice-66056 (last visited Mar. 25, 2020).

94.     As one commentator put it, "The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances.  In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach." Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, PLAN SPONSOR (Jan. 2011).[13]

95.     Thus, it is incumbent upon large plan fiduciaries, like Defendants, to select the lowest-cost class of shares that is available to the Plan.

**B.     Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

96.     The Supreme Court has reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

97.     The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's

---

[13] Available at: https://www.plansponsor.com/magazine/class-ifying-mutual-funds/ (last visited Jan. 14, 2020).

continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id*. § 2 comment.

98.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

99.     When large plans, like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

100.     The Plan has retained numerous actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, shown in the tables below, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs. During the Class Period the Plan included only three index funds. Yet even as to the few index funds included among the investment options, Defendants failed in their duty to ensure reasonable fees. As noted above, the Plan selected the Dryden S&P 500 Index Fund, with an expense ratio of 0.12%, making

it three times more expensive than the comparable Vanguard Institutional Index I, which has an expense ratio of 0.04%. Since the performance of the Dryden S&P 500 Index Fund mirrors that of the Vanguard Institutional Index I Fund, there is no prudent reason for Defendants to select and/or to retain the substantially more expensive Dryden S&P 500 Index Fund..

101.    During the Class Period, the Plan lost millions of dollars by offering high-priced investment options instead of other funds that were materially less expensive and had similar, if not identical, characteristics.

102.    Upon information and belief, most funds in the Plan stayed the same during the Class Period. Using services that are readily available to ERISA fiduciaries to analyze the current Plan offerings, as reported in the Form 5500 for the year ended September 30, 2018, 21 out of the 26 funds in the Plan – a staggering *80%* of funds – were significantly more expensive than comparable funds found in similarly-sized plans (*i.e.*, plans having $500 million to $1 billion in assets). The expense ratios for funds in the Plan in two cases are as much as *179%* greater than the expense ratio for comparable funds available to the Plan. *See*, *e.g.*, BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2015* at 69  (March 2018) (hereafter, "ICI Study").[14]

103.    The table below provides a comparison of the 20 funds described above along with substantially similar funds that employ the same investment strategies and have at least 90 percent similar holdings, but currently have significantly lower net expense ratios:

| Current Fund Option and Value of Holdings in Plan as of 12/31/2018 | Net Expense Ratio | Similar Fund with Lower Fee | Net Expense Ratio |
|---|---|---|---|
| RXPF02565 $32,524,441 Principal LifeTime Hybrid 2025 CIT Z | 0.29 % | VTTVX Vanguard Target Retirement 2025 Inv | 0.13 % |

---

[14] *See* https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf.

| | | | |
|---|---|---|---|
| RXPF02566 $27,061,435<br>Principal LifeTime Hybrid 2030<br>CIT Z | 0.29 % | VTHRX<br>Vanguard Target Retirement 2030<br>Inv | 0.14 % |
| RXPF02567 $21,514,237<br>Principal LifeTime Hybrid 2035<br>CIT Z | 0.29 % | VTTHX<br>Vanguard Target Retirement 2035<br>Inv | 0.14 % |
| RXPF02564 $18,071,791<br>Principal LifeTime Hybrid 2020<br>CIT Z | 0.29 % | VTWNX<br>Vanguard Target Retirement 2020<br>Inv | 0.13 % |
| RXPF02568 $12,724,283<br>Principal LifeTime Hybrid 2040<br>CIT Z | 0.29 % | VFORX<br>Vanguard Target Retirement 2040<br>Inv | 0.14 % |
| RXPF02569 $12,262,050<br>Principal LifeTime Hybrid 2045<br>CIT Z | 0.29 % | VTIVX<br>Vanguard Target Retirement 2045<br>Inv | 0.15 % |
| RXPF02570 $8,275,383<br>Principal LifeTime Hybrid 2050<br>CIT Z | 0.29 % | VFIFX<br>Vanguard Target Retirement 2050<br>Inv | 0.15 % |
| RXPF02563 $5,317,711<br>Principal LifeTime Hybrid 2015<br>CIT Z | 0.29 % | VTXVX<br>Vanguard Target Retirement 2015<br>Inv | 0.13 % |
| RXPF02571 $2,969,353<br>Principal LifeTime Hybrid 2055<br>CIT Z | 0.29 % | VFFVX<br>Vanguard Target Retirement 2055<br>Inv | 0.15 % |
| RXPF02572 $790,872<br>Principal LifeTime Hybrid 2060<br>CIT Z | 0.29 % | VTTSX<br>Vanguard Target Retirement 2060<br>Inv | 0.15 % |
| FGRFX $112,445,003<br>Fidelity Growth Company Fund<br>Class F | 0.72 % | TILIX<br>TIAA-CREF Large-Cap Gr Idx Instl | 0.05 % |
| | | TBCIX<br>T. Rowe Price Blue Chip Growth I | 0.57 % |
| RXPF00898 $82,665,166<br>Dryden S&P 500 Index Fund | 0.12 % | FXAIX<br>Fidelity 500 Index | 0.02 % |
| | | VINIX<br>Vanguard Institutional Index I | 0.04 % |
| | | VLISX<br>Vanguard Large Cap Index<br>Institutional | 0.04 % |
| | | SPINX<br>SEI S&P 500 Index A (SIIT) | 0.05 % |
| | | TISPX<br>TIAA-CREF S&P 500 Index Instl | 0.05 % |
| RXPF00607 $37,944,395<br>Prudential Large Cap Value /<br>LSV Asset Management Fund | 1.12 % | TILVX<br>TIAA-CREF Large-Cap Value Idx<br>Inst | 0.06 % |
| | | VMVLX<br>Vanguard Mega Cap Value Index<br>Instl | 0.06 % |
| | | VRVIX<br>Vanguard Russell 1000 Value<br>Index I | 0.07 % |
| | | VSPVX<br>Vanguard S&P 500 Value Index<br>Instl | 0.08 % |

| | | | VEIRX Vanguard Equity-Income Adm | 0.18 % |
|---|---|---|---|---|
| RXPF00617 $36,539,831 Prudential Mid Cap Growth / Artisan Partners Fund | 1.22 % | | DBMYX BNY Mellon Sm/Md Cp Gr Y | 0.65 % |
| | | | HRAUX Carillon Eagle Mid Cap Growth R6 | 0.66 % |
| | | | JDMNX Janus Henderson Enterprise N | 0.66 % |
| RXPF00613 $36,345,188 Prudential International Growth / Artisan Partners Fund | 1.14 % | | VIAAX Vanguard Intl Div Apprec Idx Adm | 0.25 % |
| | | | VWILX Vanguard International Growth Adm | 0.32 % |
| RXPF02534 $20,241,889 Prudential Small Cap Growth / TimesSquare Fund | 1.25 % | | VRTGX Vanguard Russell 2000 Growth Index I | 0.08 % |
| | | | FGROX Emerald Growth Institutional | 0.71 % |
| | | | DSGGX Delaware Small Cap Growth Institutional | 1.05 % |
| DODFX $11,404,076 Dodge & Cox International Stock | 0.63 % | | 97183J616 BlackRock EAFE Equity Index Fund Fee Class 1 AST Wilmington CIT | 0.02 % |
| | | | FLCPX Fidelity SAI US Large Cap Index | 0.02 % |
| | | | FSPSX Fidelity International Index | 0.04 % |
| | | | VTMNX Vanguard Developed Markets Index Instl | 0.05 % |
| | | | FSGGX Fidelity Global ex US Index | 0.06 % |
| RXPF00608 $4,050,791 Prudential Day One IncomeFlex Target Balanced Fund | 1.76 % | | PALRX PGIM Balanced R | 1.47 % |
| TSVQX $1,903,986 PGIM QMA Small-Cap Value R6 | 0.63 % | | VSIAX Vanguard Small Cap Value Index Admiral | 0.07 % |
| | | | VYSVX Vericimetry US Small Cap Value | 0.61 % |
| PMVQX $1,643,127 PGIM QMA Mid-Cap Value R6 | 0.73 % | | VASVX Vanguard Selected Value Inv | 0.33 % |

104.   The comparisons in table above demonstrate that for at least 20 out of the 26 funds currently in the Plan, there are many equivalent investments that would cost participants far less than the funds selected for the Plan by Defendants.

105.    The chart above demonstrates that the expense ratios of the Plan's investment options were higher by multiples than comparable alternative funds in the same investment style. A reasonable investigation by the Plan's fiduciaries would have revealed the existence of these lower-cost alternatives.

106.    For example, the 1.12% expense ratio of the Prudential Large Cap Value / LSV Asset Management Fund is **179.6%** greater than the 0.06% expense ratio of the comparable Vanguard Mega Cap Value Index Inst. fund and the TIAA-CREF Large-Cap Value Index Inst. fund. Defendants cannot justify their selection and retention of this fund on the basis that its performance has been superior to the lower cost investment options. On the contrary, during the Class Period the Prudential Large Cap Value / LSV Asset Management Fund failed to perform any better than the far less expensive Vanguard Mega Cap Value Index Instl. fund and the TIAA-CREF Large-Cap Value Index Inst. fund.

107.    Likewise, the 1.25% expense ratio of the Prudential Small Cap Growth / TimesSquare Fund is **175.94%** greater than the 0.08% expense ratio of the comparable Vanguard Russell 2000 Growth Index I fund. Defendants cannot justify their selection and retention of the Prudential Small Cap Growth / TimesSquare Fund on the grounds that its performance has been superior to the lower cost investment options like the Vanguard Russell 2000 Growth Index I fund. On the contrary, during the Class Period the Prudential Small Cap Growth / TimesSquare Fund mirrored the performance of the far less expensive Vanguard Russell 2000 Growth Index I.

108.    The Prudential Day One IncomeFlex Target Balanced Fund, with a reported expense ratio of 1.74%, is unreasonably expensive, and its results underperform as compared to its benchmark index. As set forth in the fund fact sheet, this fund is actually a group variable

annuity product that, for an additional fee over and above the reported 1.74% expense ratio, can be converted to an annuity product with a "guaranteed minimum" payment, stating:

> The fund is a member of the Prudential Day One® IncomeFlex® Target Funds (the "Funds"), a series of target date funds designed to be integrated with the Prudential IncomeFlex Target® retirement income solution – a group variable annuity offered as a retirement plan option that features a guaranteed minimum withdrawal benefit for an additional fee.

109.    This group variable annuity structure means that the participant is buying a variable annuity contract rather than direct ownership in a SEC registered mutual fund. This variable annuity is comprised by an agglomeration of additional insurance company separate account annuity structures and one or more collective investment trusts, and its complex structure accounts for much of the excessive expenses of this investment. In fact, there are at least 13 underlying entities, not mutual funds, which re most likely annuities in an insurance company separate account structure and/or collective investment trust structure, all with additional costs great than the 174 bps that has been disclosed with respect to the fund.

110.    In addition to being unreasonably expensive, the Prudential Day One IncomeFlex Target Balanced Fund consistently underperforms its self-selected benchmark, the Pru DayOne IFX Target Balanced Benchmark, as shown in the table below:

Performance (%) As of 03/31/2020

| | Performance (%) Cumulative Returns | | | As of 3/31/2020 Average Annual Total Returns | | | |
|---|---|---|---|---|---|---|---|
| | QTD | YTD | 1 Year | 3 Year | 5 Year | 10 Year | Since Inception |
| **Fund** | -13.49 | -13.49 | -6.66 | 0.67 | 1.54 | 4.41 | -- |
| **Primary** Index | -10.74 | -10.74 | -2.42 | 3.38 | 3.73 | 6.12 | |

111.    Finally, the comparisons above greatly underestimate the excessiveness of the investment management fees for the Plan's funds, because Defendants selected numerous underperforming and unreasonably expensive *actively* managed funds, when substantially less

expensive *passively* managed index funds would have resulted in superior long-term performance by comparison to the exact same benchmarks used to evaluate the performance of the Plan's fund offerings.

**C.     Defendant Imprudently Retained Historically Underperforming Plan Investments**

112.     Given Defendants' failure to conduct appropriate due diligence in selecting and retaining Plan investments, numerous investment options underperformed their benchmarks (as well as lower-cost alternative investments that were available to the Plan).

113.     Prudent fiduciaries of large defined contribution plans must regularly analyze the Plan's investment options to determine whether its actively managed funds will outperform their benchmark, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to continue to offer that particular actively managed option for the particular investment style and asset class.

114.     Defendants failed to undertake such analysis when they selected and retained the actively managed funds in the chart, below. Defendants provided these fund options without conducting a prudent analysis despite the acceptance within the investment industry that active managers typically do not outperform passive managers net of fees over the long-term.

115.     Had such an analysis been conducted by Defendants, they would have determined that the actively managed funds in the chart below generally underperformed their respective fund categories' benchmarks over extended periods

116.     Defendants' failure to remove these consistently underperforming investments demonstrates the absence of a prudent process to evaluate the Plan's investment offerings. Had Defendants adopted prudent processes in order to discharge their fiduciary duties, the funds below

would have been placed on watchlists and tracked on a regular basis to determine if the reason for their poor performance had persisted – in which case the funds should have been removed – or whether the underperformance was merely the result of a transient market trend or some other factor that would correct itself within a reasonable period of time.

117.    The following performance chart compares the investment returns of certain of the Plan's investments to their respective fund categories' benchmarks for the one-, five-, and ten-year periods ending December 31, 2018.

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| **In Plan** | $32,524,441 Principal LifeTime Hybrid 2025 CIT Z Benchmark: Vanguard Target Retirement 2025 Inv | 0.29 % | 19.24 % | 8.69 % | 6.62 % | - | -0.39% | -0.88% | -0.37% | - |
| Low Fee Alternative | VTTVX Vanguard Target Retirement 2025 Inv | 0.13 % | 19.63 % | 9.57 % | 6.99 % | 8.59 % | 0.00% | 0.00% | 0.00% | 0.00% |
| **In Plan** | $27,061,435 Principal LifeTime Hybrid 2030 CIT Z Benchmark: Vanguard Target Retirement 2030 Inv | 0.29 % | 20.91 % | 9.40 % | 7.12 % | - | -0.16% | -0.84% | -0.29% | - |
| Low Fee Alternative | VTHRX Vanguard Target Retirement 2030 Inv | 0.14 % | 21.07 % | 10.24 % | 7.41 % | 9.07 % | 0.00 % | 0.00 % | 0.00 % | 0.00 % |
| **In Plan** | $21,514,237 Principal LifeTime Hybrid 2035 CIT Z Benchmark: Vanguard Target Retirement 2035 Inv | 0.29 % | 22.68 % | 10.07 % | 7.59 % | - | 0.24 % | -0.79 % | -0.22 % | - |
| Low Fee Alternative | VTTHX Vanguard Target Retirement 2035 Inv | 0.14 % | 22.44 % | 10.86 % | 7.81 % | 9.54 % | 0.00 % | 0.00 % | 0.00 % | 0.00 % |
| **In Plan** | $18,071,791 Principal LifeTime Hybrid 2020 CIT Z Benchmark: Vanguard Target Retirement 2020 Inv | 0.29 % | 17.17 % | 7.94% | 6.07% | - | -0.46 % | -0.78 % | -0.35 % | - |
| Low Fee Alternative | VTWNX Vanguard Target Retirement 2020 Inv | 0.13 % | 17.63 % | 8.72% | 6.42% | 8.03% | 0.00% | 0.00% | 0.00% | 0.00% |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **In Plan** | $12,724,283 Principal LifeTime Hybrid 2040 CIT Z Benchmark: Vanguard Target Retirement 2040 Inv | 0.29 % | 23.85 % | 10.49% | 7.93% | - | -0.01% | -0.99% | -0.27% | - |
| Low Fee Alternative | VFORX Vanguard Target Retirement 2040 Inv | 0.14 % | 23.86 % | 11.48% | 8.20% | 9.87% | 0.00 % | 0.00 % | 0.00 % | 0.00 % |
| **In Plan** | $12,262,050 Principal LifeTime Hybrid 2045 CIT Z Benchmark: Vanguard Target Retirement 2045 Inv | 0.29 % | 24.78% | 10.79% | 8.1 % | - | -0.16% | -1.01% | -0.30% | - |
| Low Fee Alternative | VTIVX Vanguard Target Retirement 2045 Inv | 0.15 % | 24.94% | 11.80% | 8.41% | 9.98% | 0.00 % | 0.00 % | 0.00 % | 0.00 % |
| **In Plan** | $8,275,383 Principal LifeTime Hybrid 2050 CIT Z Benchmark: Vanguard Target Retirement 2050 Inv | 0.29 % | 25.58 % | 11.06% | 8.38% | - | 0.60 % | -0.74 % | -0.03 % | - |
| Low Fee Alternative | VFIFX Vanguard Target Retirement 2050 Inv | 0.15 % | 24.98 % | 11.80 % | 8.41% | 9.98% | 0.00 % | 0.00 % | 0.00 % | 0.00 % |
| **In Plan** | $5,317,711 Principal LifeTime Hybrid 2015 CIT Z Benchmark: Vanguard Target Retirement 2015 Inv | 0.29 % | 15.18 % | 7.12 % | 5.41 % | - | 0.37 % | -0.38 % | -0.18 % | - |
| Low Fee Alternative | VTXVX Vanguard Target Retirement 2015 Inv | 0.13 % | 14.81% | 7.50 % | 5.59 % | 7.25% | 0.00 % | 0.00 % | 0.00 % | 0.00% |
| **In Plan** | $2,969,353 Principal LifeTime Hybrid 2055 CIT Z Benchmark: Vanguard Target Retirement 2050 Inv | 0.29 % | 26.16% | 11.25% | 8.50% | - | 1.18 % | -0.55% | 0.09% | - |
| Low Fee Alternative | VFFVX Vanguard Target Retirement 2055 Inv | 0.15 % | 24.98 % | 11.80% | 8.38% | - | 0.00 % | 0.00 % | -0.03% | - |
| **In Plan** | $790,872 Principal LifeTime Hybrid 2060 CIT Z Benchmark: Vanguard Target Retirement 2050 Inv | 0.29 % | 26.45 % | 11.38% | 8.63 % | - | 1.47 % | -0.42 % | 0.22% | - |
| Low Fee Alternative | VTTSX Vanguard Target Retirement 2060 Inv | 0.15 % | 24.96 % | 11.79% | 8.38 % | - | -0.02 % | -0.01 % | -0.03 % | - |
| **In Plan** | $191,230,964 Prudential Guaranteed Interest Account (GIA) | 0.10 % | 3.00 % | 3.00 % | 3.00 % | 3.00 % | - | - | - | - |

37

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **In Plan** | FGRFX $112,445,003 Fidelity Growth Company Fund Class F Benchmark: iShares Russell 1000 Growth ETF | 0.72 % | 24.55 % | 19.51 % | - | - | -11.3% | -0.68% | - | - |
| Low Fee Alternative | TILIX TIAA-CREF Large-Cap Gr Index Instl | 0.05 % | 36.27 % | 20.39 % | 14.56 % | 15.13 % | 0.41 % | 0.20 % | 0.15 % | 0.14 % |
| Low Fee Alternative | TBCIX T. Rowe Price Blue Chip Growth I | 0.57 % | 30.13 % | 22.03% | 15.36% | 16.03 % | -5.73 % | 1.84 % | 5.93 % | - |
| **In Plan** | $82,665,166 Dryden S&P 500 Index Fund Benchmark: iShares Russell 1000 ETF | 0.12 % | 31.25 % | 15.15% | 11.64% | 13.49 % | 0.19 % | 0.30 % | 0.30 % | 0.09 % |
| Low Fee Alternative | FXAIX Fidelity 500 Index | 0.02 % | 31.47 % | 15.25% | 11.69% | 13.54 % | 0.41 % | 0.40 % | 0.35 % | - |
| Low Fee Alternative | VINIX Vanguard Institutional Index I | 0.04 % | 31.46 % | 15.24% | 11.67% | 13.53 % | 0.40 % | 0.39 % | 0.33 % | 0.13 % |
| Low Fee Alternative | VLISX Vanguard Large Cap Index Institutional | 0.04 % | 31.39 % | 15.28% | 11.57% | 13.52 % | 0.33 % | 0.43 % | 0.23 % | 0.12 % |
| Low Fee Alternative | SPINX SEI S&P 500 Index A (SIIT) | 0.05 % | 31.44 % | 15.22% | 11.65% | - | 0.38 % | 0.37 % | 0.31 % | - |
| Low Fee Alternative | TISPX TIAA-CREF S&P 500 Index Instl | 0.05 % | 31.42 % | 15.20% | 11.63% | 13.48 % | 0.36 % | 0.35 % | 0.29 % | 0.08 % |

118.    In 2015, the Supreme Court unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 575 U.S. 523. In contrast to the conduct of a prudent fiduciary, Defendants failed to conduct a prudent process to monitor the funds in the chart above and they continue to retain these funds despite their continuing underperformance compared to their benchmarks. Moreover, as shown above, there were abundant lower-cost investment alternatives readily available to the Plan for each of these investments.

119.    Prudent fiduciaries of defined contribution plans must continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by

38

prudent independent fiduciaries, the funds in the chart above would have been removed from the Plan.

120.    As shown in the charts above, each of the Principal LifeTime Hybrid CIT target retirement date funds – the Plan's default investment option – charges 29 bps, which is more than double the expense of comparable Vanguard target retirement date funds, which charge 13 bps. Defendants cannot justify the expenses that Principal LifeTime Hybrid CIT target date funds charged Plan participants on the grounds that they are paying for superior performance. On the contrary, as shown in the table above, each of the Principal LifeTime Hybrid CIT target retirement date funds consistently underperformed the comparable Vanguard target retirement date fund and their respective benchmarks over 1-, 3-, and 5-year periods. Thus, the expense of the Principal LifeTime Hybrid CIT target retirement date funds has been unreasonably high throughout the Class Period. Defendants' failure to remove the imprudent Principal LifeTime Hybrid CIT target retirement date funds from the Plan is evidence of a flawed fiduciary process and is a breach of their fiduciary duties.

121.    Had the Defendant removed these funds from the Plan and the amounts been invested in any of the lower-cost alternatives identified herein, participants in the Plan would not have lost millions of dollars' worth of their retirement savings.

**D.     Defendants Breached Their Fiduciary Duties by Causing the Plan to Pay Excessive Compensation to Prudential in Violation of ERISA's Prohibited Transaction Rules**

122.    It was imprudent for Defendants to select and retain the Prudential Guaranteed Interest Contract Account ("Prudential GIC"), which was the single largest holding in the Plan with $191,230,964 invested as of December 31, 2018. The Prudential GIC is a stable value insurance general account product that is designed to provide liquidity and a stable rate of return. Plan assets in the Prudential GIC are invested as an undivided portion of The Prudential Insurance

Company of America's ("PICA") General Account, which invests the Plan's funds in a portfolio of bonds and common stocks.

123.     Because Plan assets invested in the Prudential GIC are transferred to PICA's general account, PICA retains the spread between the overall rate of return on the general account and the interest credited to Plan participants who invest in the Prudential GIC, and thus, there is a transfer of Plan assets to, or use by or for the benefit of, a party in interest, which is prohibited by ERISA § 406(a)(1)(D). Under this arrangement, the aggregate compensation being received by PICA for Prudential GIC equals: (i) the return on the investment of the Plan funds transferred to the PICA general account, plus the nominal 0.10% expense ratio paid by Participants in the Prudential GIC, less (ii) the interest credited to Plan participants in the Prudential PICA This results in compensation to PICA that greatly exceeds a reasonable fee in relation to the costs of administering the Prudential GIC.

124.     29 C.F.R. § 2550.408b-2(c) states in no uncertain terms that, "[n]o contract or arrangement for services between a covered plan and a covered service provider, nor any extension or renewal, *is reasonable within the meaning of section 408(b)(2) of the Act* and paragraph (a)(2) of this section *unless* the "covered service provider" (specifically defined to include plan record keepers, custodians, brokers and investment platform providers) receives *no more than reasonable compensation* in relation to the services provided. *Id*. (Emphasis added).

125.     A covered service provider must disclose to the responsible plan fiduciary, *inter alia*, all indirect compensation, including: "A description of all indirect compensation (as defined in paragraph (c)(1)(viii)(B)(2) of this section) that the covered service provider, an affiliate, or a subcontractor reasonably expects to receive in connection with the services described pursuant to paragraph (c)(1)(iv)(A) of this section…." If the requirements of 29 C.F.R. 2550.408b-2(c) are not

met, the responsible plan fiduciary's decision to enter into a contract with a service provider to provide services to the plan constitutes a non-exempt prohibited transaction, in violation 29 U.S.C. § 1106, unless the responsible plan fiduciary can establish:

> The responsible plan fiduciary did not know that the covered service provider failed or would fail to make required disclosures *and reasonably believed* that the covered service provider disclosed the information required by paragraph (c)(1)(iv) or (vi) of this section;

> The responsible plan fiduciary, *upon discovering that the covered service provider failed to disclose the required information, requests in writing that the covered service provider furnish such information*; and

> If the covered service provider fails to comply with such written request within 90 days of the request, then *the responsible plan fiduciary notifies the Department of Labor* of the covered service provider's failure, in accordance with paragraph (c)(1)(ix)(E) of this section.

29 C.F.R. 2550.408b-2(c)(1)(ix) (emphasis added).

126.     Here, Defendants have failed to disclose in the Plan's form 5500s the indirect compensation received by PICA in connection with the Prudential GIC, and such compensation is presumptively unreasonable in relation to the services being provided. Moreover, Defendants, as fiduciaries of the Plan, knew or should have known that such compensation was unreasonable due to the anomalous spread-based fee structure, but Defendants nonetheless approved such compensation. Thus, this investment constitutes a prohibited transaction that does not meet the strict conditions specified by federal regulations to qualify for an exemption under ERISA § 408.

### E.     Defendants Failed to Monitor or Control the Plan's Recordkeeping and Other Administrative Expenses

127.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These

services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services. Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

128.   The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

129.   According to a study conducted by Deloitte Consulting LLP for the Investment Company Institute, on average, administrative expenses – the largest of which, by far, is recordkeeping – make up 18% of total plan fees. *See Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013: A study assessing the mechanics of the 'all-in' fee*, at 17 (Aug. 2014) (stating: "recordkeeping, administrative and financial advice fees made up 18% of total fees").[15]

130.   The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven

---

[15] Available at: https://www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-cons-401k-fee-study-2013-082014.pdf

by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

131.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

132.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees in order to ensure that such fees remain reasonable. *See, e.g., Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

133.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

134.     Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing

43

being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

135.    Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George*, 641 F.3d at 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

136.    Defendants have wholly failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps. Defendants permitted the Plan to pay its recordkeeper, Prudential Retirement Insurance and Annuity Company ("Prudential"), the following per participant recordkeeping and other administrative costs during the Class Period:

| Year | No. of Participants | Direct Costs | Indirect Costs (revenue sharing) | P/P cost |
|------|--------------------|--------------|-----------------------------------|----------|
| 2018 | 8,787 | $813,175 | undisclosed | $92.54 |
| 2017 | 8,838 | $530,569 | undisclosed | $60.03 |
| 2016 | 8,787 | $230,224 | undisclosed | $26.20 |
| 2015 | 8,769 | $200,737 | undisclosed | $22.89 |

137.     In addition to the above recordkeeping and administrative expenses, the Plan paid substantial amounts through revenue sharing arrangements with the various fund families through which the Plan offers investment options, however, the Plan has not disclosed the amount of revenue sharing payments it made during time period relevant to this action.

138.     The total amount of recordkeeping and administrative fees paid during the Class Period on a per participant basis has been unreasonable. Based on Plaintiffs' investigation and analysis, normal recordkeeping fees for a $500 - $999 million dollar plan with less than 12,000 participants would have been between $20 and $40 per participant at the beginning of the Class Period and lower in ensuing years as a reflection of the general trend of decreasing recordkeeping fees. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d 786 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D. Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

139.     The increase in recordkeeping costs (as measured on a per participant basis) far out-paced the modest growth in the number of participants from the start of the Class Period until the present, indicating the Plan's fiduciaries failed to leverage the growing size of the Plan (by both participants and assets) to achieve lower per participant costs.

140.     Given the increase in size of the Plan's assets during the Class Period and total number of unique participants, in addition to the general trend towards lower recordkeeping

expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services that would have been provided by its recordkeeper, Prudential, to the Plan. On information and belief, Prudential has performed the following tasks for the Plan:

- Receives the Plan contributions;

- Credits accounts for those contributions; and

- Pays benefits to participants and/or their beneficiaries.

141. In other words, the services provided by Prudential were nothing out of the ordinary. A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted separate and independent breaches of the duties of loyalty and prudence.

### FIRST CLAIM FOR RELIEF
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against Konica and Committee Defendants)**

142. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

143. At all relevant times, the Company and Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

144. As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

145.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. Likewise,  the  Prudence Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

146.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

147.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

148.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit

breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Konica and the Board Defendants)

149.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

150.    Konica and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

151.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

152.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Konica and the Board Defendants.

153.    Konica and the Board Defendants breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)     failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost separate account and collective trust vehicles; and

(c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

154.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had Konica and the Board Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

155.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Konica and the Board Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

### THIRD CLAIM FOR RELIEF
**Prohibited Transaction - Excessive and Unreasonable Compensation for Services in Violation of ERISA §408(b)(2)**

156.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

157.    Section 406(a)(1)(C) of ERISA, 29 USC § 1106(a)(1)(C), generally prohibits the direct or indirect furnishing of services between a plan and a party-in-interest.

158.    Section 408(b)(2) of ERISA, 29 USC § 1108(b)(2) exempts from the prohibitions of ERISA § 406(a)(1)(C) "contracting or making reasonable arrangements with a party in interest

for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, *if no more than reasonable compensation is paid therefor.*" (emphasis added).

159.    The spread between the interest earned by PICA on its General Account and the interest credited to Plan participants in the Prudential GIC constitutes excessive and unreasonable compensation in relation to the services provided.

160.    Defendants have breached their fiduciary duties to the Plan by causing the Plan to enter into a contract that permits PICA's compensation for providing the Prudential GIC to be based on the spread between the guaranteed interest rate credited to participant accounts and the amount PICA earns on its General Account, and thereby permitting PICA to receive unreasonable and excessive compensation for the services provided.

161.    Defendant is liable under 29 U.S.C. §1109(a) for any losses to Plaintiffs and the Class resulting from the breaches of fiduciary duty alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Fed. R. Civ. P. 23(b)(2);

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting

from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Employer Defendants as necessary to effectuate said relief, and to prevent the Employer Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

[SIGNATURES ON FOLLOWING PAGE]

51

Dated: June 4, 2020

By: _____

Eric Lechtzin (NJ Bar # 011841992)
Mark H. Edelson (*pro hac vice* anticipated)
**EDELSON LECHTZIN LLP**
3 Terry Drive, Suite 205
Newtown, PA 18940
Telephone: (215) 867-2399
Facsimile: (267) 685-0676
elechtzin@edelson-law.com
medelson@edelson-law.com

Todd S. Collins (*pro hac vice* anticipated)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: 215-875-3600
Fax: 215-875-4604
tcollins@bm.net